# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| **FRANKLIN WILLIAMS,**   )<br>                              )<br>         **Plaintiff,**   )<br>    **v.**                      )<br>                              )<br>                              )<br> **CAROLYN W. COLVIN,**   )<br>                              )<br>    **Acting Commissioner of**   )<br>    **Social Security,**      )<br>                              )<br>                              )<br>_____  ) | Civil Case No. 2:14-cv-02129-RBH-MGB<br><br><br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Franklin Williams, through counsel, brought this action to obtain judicial review of an unfavorable final administrative decision denying benefits on his 2010 application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). See Section 205(g) of the SSA, as amended, 42 U.S.C. Section 405(g). This matter was referred to the Magistrate Judge for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and Title 28, United States Code, Section 636(b)(1)(B). Having carefully considered the parties' briefs, the administrative record, and applicable authority, the undersigned recommends that the Commissioner's final decision be **affirmed**, based upon the following proposed findings of fact and conclusions of law:

**I. Relevant Statutory Law, Sequential Process, and Burdens of Proof**

Under the SSA, a "claimant for disability benefits bears the burden of proving a disability." *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). For purposes of the statute, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). As the Commissioner correctly indicated, the Social Security regulations set forth a five-step sequential process that takes into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition. (AR 4, 24-25, citing 20 C.F.R. § 404.1520) The Fourth Circuit Court of Appeals has succinctly stated that, to be entitled to benefits, "[t]he claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity ["RFC"] to (4) perform [the claimant's] past work or (5) any other work." *Albright v. Commissioner*, 174 F.3d 473, 475 n. 2 (4th Cir. 1999). The claimant bears the burden of production and proof through the fourth step. "If the claimant reaches step five, the burden shifts to the government." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). In the present case, the ALJ determined that the Plaintiff was not disabled at the fifth step of the sequential process.

## II.  Factual Background and Procedural History

The relevant facts have been set forth in the Commissioner's decision and are summarized as follows: Plaintiff was born June 7, 1976 (a "younger individual"), has at least a ninth-grade education ("limited"),[1] is married with four children, lives with his wife and two younger children, and has past work experience as a construction worker, forklift operator, and machine operator (classified as "unskilled to semi-skilled" and "medium to heavy").[2] (AR 27,

---

[1] At different times, Plaintiff has inconsistently indicated that he completed 12th grade or dropped out of school in 10th grade. (AR 225, 387). He indicated at the hearing he has not obtained his GED. (AR 79).

[2] Plaintiff indicates he lifted 50-100 pounds in some of his past jobs. (AR 50, 53, 56, 59). Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, while "heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. 20 C.F.R. § 404.1567(c-d).

58, 81-82, 202, 239). Plaintiff is literate, communicates in English, and has a driver's license. (AR 60, 223). He has reportedly participated in a substance abuse program and obtained outpatient treatment at a methadone clinic (AR 67, 231, 439). Plaintiff alleges he stopped working due to a back injury he suffered in early 2004. He received worker's compensation benefits for that injury and settled the claim in 2005. (AR 196-200). Meanwhile, in 2004, Dr. Charles Kanos, M.D., performed two "microdiscectomies" at the L5-S1 level to remove laminar material and the L4-5 vertebrae were then surgically fused in November 2004 (AR 29). Dr. Kanos indicated in January 2005 that the patient "has no leg pain" and reports being "90% better." (AR 396). As treating physician, Dr. Kanos indicated "I am returning him to work to light duty, no lifting greater than 30 lbs., and no repetitive bending greater than 60 degrees. After one month, I would like him to return to a more regular duty but no lifting greater than 70 lbs." (AR 396).

Plaintiff's condition was also briefly followed by Dr. Kevin Kopera, M.D., who advised him to seek vocational rehabilitation. (AR 286). On January 21, 2005, Dr. Kopera indicated that "in talking to Mr. Williams today he felt that he could return to work." (AR 290 observing that Plaintiff "is able to lift his young child that weighs approximately 20 lbs. and does fairly well doing this and it does appear that he is able to lift 20 lbs."). Dr. Kopera further indicated: "This afternoon a pharmacist contacted the office indicating that Mr. Williams has been receiving prescriptions of OxyContin simultaneously from Dr. Kanos as well as myself … at this point we will not be prescribing any additional prescriptions for OxyContin for Mr. Williams." (Id.). Dr. Kopera shortly thereafter terminated the patient relationship. Plaintiff indicates that he did not seek vocational rehabilitation, and after working as a cook for three months in 2006, stopped looking for any other kind of work, even light duty. (AR 27, 49). Although he later claimed he

could not afford vocational rehabilitation and was "working" on his GED, the ALJ reminded him that such service is free and would help him obtain his GED (AR 28, 78-79).

On May 20, 2008, Plaintiff, through counsel, filed applications for Title II disability benefits ("DIB") and Title XVI supplemental security income (SSI"). (AR 102). He alleged a disability onset date of April 15, 2005, based on his back injury.

On February 19, 2010, he underwent a laser disc procedure at L4-5. On March 10, 2010, Plaintiff's treating physician, Dr. Ashish Shanbhag, M.D., conducted a follow-up evaluation and CT scan that revealed only a "mild" disc bulge at the L3-5 level. (AR 29). This physician noted that Plaintiff was "fluid and non-antalgic" in gait, had symmetric posture and muscle tone, and that the "initial flare-up pain has now resolved" (AR 368). The treatment notes indicate that Plaintiff showed no signs of nerve root compression, was medically stable, and was functioning well with treatment. In fact, Dr. Shanbhag indicated that Plaintiff self-reported that he was "overall 95% better in the low back," was using less medication, and had a "marked increase" in functional activity. (Id., indicating patient expressed "his satisfaction at length"). Dr. Shanbhag observed that Plaintiff's lumbar spine "range of motion [was] fluid, unrestricted, and nonpainful in all cardinal planes, except for flexion, i.e. the patient had limitation in range of motion, not secondary to pain, but limitations mechanically … secondary to his fusion." Id. Dr. Shanbhag recommended a home exercise/stretching program and indicated he planned to gradually discontinue Plaintiff's use of Lortab.

On August 12, 2010, Administrative Law Judge Alice Jordan ("ALJ") reviewed the record, including the physical RFC assessments by three consulting physicians (AR 119), and granted disability benefits to Plaintiff for a closed period from April 15, 2005 through March 10,

2010. (AR 102-114). The ALJ concluded that after March 10, 2010, the Plaintiff could perform a range of "light" work within his restrictions.

Plaintiff, through counsel, protectively refiled for disability insurance benefits on September 22, 2010, alleging disability as of April 15, 2005 (later amended to March 12, 2010) due to alleged ongoing back problems. Treating source notes continued to indicate that Plaintiff's posture and muscle tone were symmetric and "unchanged in bilateral lower limbs" (AR 338, 2/16/2011) and that he was "stable medically and functioning well with medication." (AR 337, 3/16/2011). In September 2011, Plaintiff began treating with Dr. Robert Westrol, M.D., a pain management specialist, who scheduled a new MRI and prescribed pain medication. Neurologist Dr. Jeff Shramek, M.D., reviewed Plaintiff's lumbar spine X-rays and MRI taken on October 19, 2011. (AR 379-380). He found normal T11-12 through L2-3 discs and indicated "there may be slight L4-5 disc degeneration." Dr. Westrol noted these "mild" conditions and recommended conservative treatment consisting of medication, exercise, and stretching exercises (AR 385). His notes indicate that although Plaintiff complained of generalized tenderness and some pain on straight leg raising and various maneuvers, Plaintiff had normal muscle strength (rated 5/5), showed no significant signs of muscle atrophy, and had normal gait and balance. (AR 391, 9/20/2011 and at 385, 10/20/2011). He gave Plaintiff several steroid injections over the course of 2011-2012. Plaintiff testified that he usually saw Dr. Westrol once a month. (AR 76 "For the most part, he just gives me the two, the two medications that he gives me. He has been trying to do injections of, epidural-type injection … He's done three."). Dr. Westrol's subsequent notes indicate that Plaintiff's clinical findings remained stable and that his gait and balance remained normal. (AR 417, 05/15/2012). Although Plaintiff told Dr. Westrol that he had "no history of illicit drug use" or "prescription misuse," (AR 384, 416), Dr. Westrol learned in May 2012 that

Plaintiff had been receiving treatment at a methadone clinic for over a year. (AR 418). He refused to prescribe any more controlled drugs for Plaintiff.

On February 22, 2011, Plaintiff underwent a consultative examination by Larry Korn, D.O. ("CE"), who noted that Plaintiff lumbosacral extension was "mildly limited" (AR 317-318). He found that Plaintiff's muscle strength was largely normal, with the exception of some weakness (rated 3/5) in one foot muscle (the "right extensor halluces longus"), which Plaintiff attributed to a prior foot fracture.[3] Given Plaintiff's history of back surgery, the CE opined that Plaintiff should not lift "heavy" loads (i.e. no more than 20 lbs.) and "would probably need a job where he could get off his feet periodically." He observed that Plaintiff "communicates and comprehends well" and indicated that, in light of his younger age and cognitive abilities, Plaintiff was a "really good candidate for retraining and additional education." (AR 318). Plaintiff indicated on his disability application that his back problems did not affect his ability to talk, hear, see, remember, understand, follow instructions, use his hands, or get along with others, but that certain medication sometimes made him sleepy, which affected his ability to concentrate at times. (AR 235-237).

In 2011, several agency consulting physicians reviewed the record and completed physical RFC assessments of Plaintiff. (AR 369-376 Dr. Seham El-Ibiary, M.D.; AR 377 Dr. Carl Anderson, M.D.; AR 378 Dr. Martha Durham, M.D.). They all indicated that Plaintiff was capable of light and sedentary work within his postural and exertional restrictions. (AR 370-71).

In his 2012 application, Plaintiff reported daily activities such as watching television "off and on all day," playing video games ("X-Box 360"), working on his car and changing the oil, doing light housework (i.e., changing bed linens, helping with laundry, vacuuming, straightening

---

[3] According to online medical dictionaries, this is a thin muscle that extends the big toe and flexes the foot. See, e.g., http://www nlm.nih.gov/medlineplus/mplusdictionary.

rooms), driving his car, shopping, going to McDonald's on a regular basis, taking his two younger children to school, helping with their homework, going to visit his two older children and/or his parents, going to the methadone clinic, and taking his family to the beach. (AR 44-45, 63-67, 231-235, 347, 387, 439). Plaintiff is able to take care of his own personal needs and hygiene, and does not use an assistive device to walk. (AR 236).

Plaintiff's 2012 application was denied initially and on reconsideration. Upon request, ALJ Jordan held a hearing on August 21, 2012, at which Plaintiff (represented by counsel) and a vocational expert ("VE") both appeared and testified. (AR 30-51). At the hearing, Plaintiff amended his alleged onset date to March 12, 2010. (AR 43). After reviewing the entire record, the ALJ issued a decision, finding that Plaintiff was not disabled from March 12, 2010 through the date of decision on September 27, 2012 (AR 23-33).

The ALJ found that Plaintiff met the insured status requirements and had not performed any substantial gainful activity since the alleged disability onset date of March 12, 2010 (AR 25, Findings 1-2). The ALJ found that Plaintiff had a "severe" impairment due to degenerative disc disease in his back, as well as a medically determinable mental impairment due to depressive disorder that minimally affected him and was "non-severe." (AR 25, Finding 3).[4] The ALJ found that the medical evidence showed that Plaintiff had no signs of nerve root compression

---

[4] An ALJ has a duty to consider all medically determinable impairments, not just those that are deemed "severe." 20 C.F.R. §§ 404.1523, 416.923. Impairments are considered separately and in combination. While there was evidence that Plaintiff had received anti-depressant medication (Elavil, Cymbalta) in 2011, he testified that he was not having any problems other than his back. (AR 68, Q: Okay. And any other problems you're having other than your back? A: No, ma'am. Q: So really the only thing that [allegedly] prevents you from working is pretty much the pain in your back? A: Yes, ma'am.). The ALJ appropriately developed the record and ordered psychiatric evaluation of Plaintiff. On October 12, 2011, Dr. Leslie Long, M.D., examined Plaintiff and indicated he had a "flat affect" but had no memory deficits, was able to concentrate appropriately, was oriented to person, place, and time, showed logical thought processes, and behaved appropriately for his age, situation, and setting. (AR 387-388). Larry Clanton, PhD., also opined in 2011 that any mental impairment was not severe. (AR 321, 331).

syndrome, arachnoiditis, or lumbar stenosis, and therefore, his back impairment did not meet or medically equal the criteria of Listing 1.04. (AR 25, Finding 4).[5]

With respect to Plaintiff's functional limitations, the ALJ then determined the Plaintiff's RFC, which is defined as "the most [one] can do despite [one's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p. The ALJ assigned certain postural and environmental restrictions, including changing positions throughout the day, not standing on concrete all day, no climbing, and only occasionally stooping, kneeling, bending, crouching, and crawling. The ALJ found that Plaintiff could lift 20 lbs. occasionally, 10 lbs. frequently, sit/stand/walk for up to six hours each in an eight hour workday, (AR 27, Finding 5).[6] The ALJ found that Plaintiff could not perform his past relevant work (classified as medium to heavy), but that he retained the RFC to perform light and sedentary work within his restrictions. (AR 32, Finding 10).

Based upon the ALJ's hypothetical question (including a "sit/stand" restriction which the VE discussed at length ), the VE testified that Plaintiff could perform various representative jobs, including finishing machine operator, surgical dressing maker, household products assembler, small electrical accessories assembler, and gasket inspector (over 10,000 jobs in South Carolina, and over 400,000 jobs nationally). Id. The ALJ determined that, based on Plaintiff's RFC, age, education, work experience, and the VE's testimony, Plaintiff could still perform a significant number of jobs existing in the national economy. The ALJ concluded that Plaintiff was not "disabled" from March 12, 2010 through the date of decision on September 27, 2012.

---

[5] Plaintiff bears the burden of establishing that his impairment met the criteria of a Listing or is "at least equal in severity and duration to [the] criteria of any listed impairment." 20 C.F.R. § 404.1526.

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a) (explaining that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

Plaintiff sought review from the Appeals Council, arguing that the RFC was "inadequate" and that the ALJ's credibility determination was "inadequate." (AR 276). On April 3, 2014, the Appeals Council granted review. The Appeals Council issued a new decision denying benefits (AR 4-9). The Appeals Council agreed with and expressly adopted the ALJ's findings at steps 1 through 5, and expanded the RFC assessment to expressly incorporate the VE's definition of the sit/stand option that the ALJ had posed in the hypothetical question at the hearing. (AR 4-5, 87-88). Specifically, the Appeals Council observed that although the RFC "as set forth in the hearing decision does not define the sit/stand option," the VE had "appeared at the hearing and provided a definition." (AR 5). The Appeals Council agreed that the "claimant's subjective complaints are not fully credible for the reasons identified" in the ALJ's decision. (AR 6, Finding 4). The Appeals Council's decision is the final decision of the Commissioner.

### III.  Standard of Review

The SSA limits this Court's review of the Commissioner's final decision to: (1) whether substantial evidence supports such decision; and (2) whether the Commissioner applied the correct legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Smith v. Heckler*, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting *Perales*, 402 U.S. at 401); *Hunter*, 993 F.2d at 34 (same). Substantial evidence is defined as "more than a mere scintilla but less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 637–38 (4th Cir. 1996).

The Fourth Circuit has emphasized that it is not for the reviewing court to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, so long as that decision is supported by substantial evidence. *Hays*, 907 F.2d at

1456; *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). It is the duty of the Commissioner, not the courts, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456; *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) ("this court does not find facts or try the case *de novo* when reviewing disability determinations"); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976) (same). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the court would decide the case differently. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982).

## IV.  Analysis

### A.  Whether the ALJ's Credibility Determination is Supported by Substantial Evidence

When assessing a claimant's credibility, the ALJ must first determine whether objective medical evidence demonstrates the existence of medically determinable impairments that could reasonably cause the alleged pain. 20 C.F.R. §§ 404.1529 and 416.929; *Craig v. Chater*, 76 F.3d 585, 596 (4th Cir. 1996). The ALJ then considers evidence of the intensity, persistence, and functionally limiting effects of the claimant's alleged pain. *Id.*; SSR 96-7p. When assessing a claimant's credibility, an ALJ considers the entire record, including: (1) the claimant's testimony and other statements concerning pain or other subjective complaints; (2) the claimant's medical history; (3) any laboratory findings; (4) objective medical evidence of pain, if any; (5) the claimant's activities of daily living; and (6) any course of treatment the claimant has undergone to alleviate pain. *Craig*, 76 F.3d at 595. The ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p.

The ALJ found that Plaintiff's back problems "could reasonably be expected to produce the alleged symptoms" but that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

above [RFC] assessment." (AR 29). The Appeals Council agreed that the "claimant's subjective complaints are not fully credible for the reasons identified" by the ALJ. (AR 5). Plaintiff contends that the credibility finding is not supported by substantial evidence (DE#13 at 22-25).

The ALJ found that Plaintiff's allegations about the extent of his pain and functional limitations were not fully credible. As the ALJ noted, the treating physicians' objective medical findings (based on 2011 X-rays, MRI, and examinations) showed only a mild disc bulge, normal muscle strength (rated at 5/5), neurological findings within normal limits, and (at most) a "slightly" antalgic gait (AR 29). The ALJ appropriately noted that the CE had indicated the Plaintiff's "gait and station were normal and he had no difficulty performing heel/toe walk or tandem walk maneuvers." (AR 29). Plaintiff does not use an assistive device to walk and testified that he "can usually walk maybe an hour, hour and a half" before his leg would start hurting. (AR 72).[7]

Plaintiff's lumbar MRI on October 10, 2011, revealed only a "mild bulge" at L3-4 and 4-5, and his treating physicians recommended only conservative treatment consisting of anti-inflammatory pain medication and several steroid injections during 2010-2012. "When considered with other information, the routine nature of a course of treatment may indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate." *Viverette v. Astrue*, 2008 WL 5087419, *2 (E.D.N.C. November 24, 2008). As the ALJ observed, the evidence in the record as a whole shows that although Plaintiff had a history of back injury and surgery, his subsequent condition was treated with medication and occasional injections, and further surgery was not medically recommended. See, e.g., *Mann v. Astrue*, 2008 WL 906346, at *16 (S.D.W.Va. Mar. 31, 2008) (explaining that the ALJ properly considered the record in evaluating claimant's credibility, including the conservative course of treatment);

---

[7] He had inconsistently claimed in his application that he could only walk 20 minutes. (AR 235).

*Hutchinson v. Astrue*, 2012 WL 1267887, *8 (M.D.N.C.) ("the issue … is not whether Plaintiff's pain exists; it undoubtedly does and the ALJ so acknowledged…[the issue is whether the ALJ considered the record as a whole and properly determined] that the extent and limiting effects of that pain were not as great as Plaintiff claimed.").

The ALJ observed that Plaintiff had not been fully truthful in responding to questions about his drug abuse. (AR 29-30). See Social Security Ruling ("SSR") 96-7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."). At the hearing, the ALJ asked Plaintiff if he had "ever had a problem with alcohol or drugs" and Plaintiff responded "No, ma'am." (AR 67). However, as the ALJ observed, the record reflected treatment records from a methadone clinic, and moreover, those records reflected that Plaintiff had not been fully compliant with treatment because he had taken diet pills (amphetamines) on multiple occasions. (AR 29-30).[8] The ALJ observed that Dr. Kopera had terminated treatment in 2005 because Plaintiff had failed to adhere to a narcotic treatment agreement, and that Dr. Westrol had also subsequently refused to prescribe any more controlled drugs for Plaintiff after learning in 2012 that Plaintiff had been treating at a methadone clinic for over one year.[9]

The ALJ observed that Plaintiff was able to engage in a wide variety of daily activities, which supports the credibility finding that Plaintiff's subjective complaints about pain and resulting functional limitations were not as severe as alleged. See *Gross v. Heckler*, 785 F.2d

---

[8] Plaintiff is six feet tall and weighs 195-203 pounds. (AR 224, 420, 433). Plaintiff complained in his application that he had gained 20 lbs. because he was restricted in his ability to walk, run, and lift weights. (AR 272).

[9] The Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 105(a)(1)(C), 110 Stat. 852, amended the definition of "disability" under Title II of the Social Security Act to bar benefits for any individual whose disability is based on alcoholism or drug addiction. 42 U.S.C. 423(d)(2)(C). Title II now states: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Id.

1163, 1166 (4th Cir. 1986) (claimant's daily activities supported ALJ's finding that the claimant's alleged impairments were not as severe as claimed); *Rogers v. Barnhart,* 204 F.Supp.2d 885, 894-95 (W.D.N.C. 2002) ("the ALJ did not just rest on the absence of objective proof of pain ... in conjunction with the medical evidence, he also considered plaintiff's daily activities") (citing *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994)). The ALJ's finding that Plaintiff's subjective complaints about the extent of his pain and functional limitations were not entirely credible is supported by substantial evidence of record, including Plaintiff's own inconsistent statements, activities of daily living, medical history (including the 2011 X-rays and MRI), and conservative medical treatment.

The ALJ properly relied upon the record as a whole when assessing the credibility of Plaintiff's subjective complaints. "It is the province of the [ALJ], and not the courts, to make credibility determinations." *Mickles*, 29 F.3d at 929. The ALJ was able to observe the demeanor and to determine the credibility of the claimant, and "the ALJ's observations concerning these questions are given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The credibility determination is supported by substantial evidence.

**B.  Whether the ALJ improperly weighed Dr. Westrol's opinion about Plaintiff's functional limitations**

To be given controlling weight, a treating source's opinion must be well-supported by medical signs and laboratory findings and consistent with the other substantial evidence of record. 20 C.F.R. § 416.927(c)(2). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590; see also, *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The regulations recognize that the nature and extent of the treatment relationship

may also affect the weight afforded by an ALJ. 20 C.F.R. § 416.927(c). Opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the SSA are not given controlling weight because the decision on that issue is reserved to the Commissioner alone. Id. at § 416.927(d).

Plaintiff complains that the ALJ "rejected" Dr. Westrol's conclusion that Plaintiff should be limited to sedentary work (DE#13 at 15). More accurately, the ALJ assigned "some weight" to Dr. Westrol's brief opinion about Plaintiff's functional abilities. In explaining the weight given to such opinion, the ALJ observed that Dr. Westrol's treatment notes reflected that the Plaintiff's "clinical findings remained stable, including his normal gait and balance." (AR 29). Dr. Westrol's two-paragraph opinion indicates he had treated Plaintiff from 9/20/2011 to 5/15/2012 (approximately eight months), seen Plaintiff on eight occasions, and given him two steroidal injections. (AR 429). Dr. Westrol noted that Plaintiff complained of "more widespread pain for which I do not have a clear etiology" and that he "would know more if we had an EMG" (AR 429, explaining that Plaintiff had cancelled a scheduled EMG). Other than pain medication and two injections, Plaintiff acknowledged at the hearing that he was receiving no other care. (AR 77, Q: are you on any other kind of treatment for pain relief? A; No, I'm not.). Plaintiff testified he was on Medicaid, and thus, had access to further care if medically recommended.

Although Dr. Westrol's treatment notes reflect some "positive straight leg raising testing and positive facet provocation testing" on examination, the ALJ accurately observed that those "test findings have been static since the claimant has been under Dr. Westrol's care" and that there were "no corresponding clinical abnormalities such as signs of nerve root compression" (AR 30). See, e.g., *Hutchinson*, 2012 WL 1267887 at *4 (observing that although physician performed some objective testing, such as straight leg raises, the treating relationship "largely

revolved" around Plaintiff's subjective reports of pain, for which [the physician] prescribed medications). The ALJ found that the claimant's clinical course has been stable since March 11, 2010 and that there had not been any significant changes in the medical findings. (AR 31). In his brief, Plaintiff points to various findings and diagnostic descriptions, but several treating physicians had deemed those conditions "mild" or "subtle" and recommended only conservative treatment (DE# 13 at 18). The objective medical evidence did not show that Plaintiff's condition had deteriorated significantly from the time (March 2010) when he was previously found capable of performing a range of light work.

The ALJ accurately pointed out that the 2010-2012 medical records of both Drs. Westrol and Shanbhag did not reflect "any signs of overt nerve root compression" or "any ongoing MRI evidence of spinal cord compression." (AR 29-30).[10] Although Plaintiff complains that "the ALJ was not qualified to draw conclusions from the raw medical evidence," (DE#13 at 23), Plaintiff has not framed the issue accurately. Compression is a specific criteria for whether a back impairment meets the relevant Listing. An ALJ may properly point out that the treatment records do not reflect any medical findings of nerve root or spinal cord compression. Although Plaintiff cites *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984) for the proposition that an ALJ may not exercise expertise she "did not possess," such case is inapposite here. The ALJ in the present case did not "substitute her opinion for the uncontradicted opinion of an examining physician." It was the ALJ's duty to review the evidence as a whole. The ALJ adequately explained specific reasons for assigning "some" weight to Dr. Westrol's opinion.

---

[10] Although plaintiff claims his condition worsened after 2010, the 2011-2012 evidence does not establish this. Such evidence is also consistent with earlier medical evidence. For example, radiologist Dr. Raul Ceballos, M.D., evaluated an August 2004 MRI and found "no evidence of recurrent disc herniation or nerve root compression." (AR 285). Similarly, Dr. Kopera indicated in late 2004 that he found "no obvious root compression." (AR 296).

Finally, Plaintiff contends (DE# 13 at 20-21) that the ALJ "rejected" Dr. Westrol's brief statement about Plaintiff's functional abilities partly because Dr. Kopera supplied a 2012 statement with nearly identical language (thereby suggesting that it was a duplicate and that Dr. Kopera did not write it himself). (AR 429-430). Plaintiff's argument lacks merit. In the first place, the ALJ indicated she *was* incorporating "some of the non-exertional restrictions cited by this physician [Dr. Westrol]" (such as being able to "change positions") and that she was giving his opinion "some weight." (AR 30). Moreover, the ALJ discussed various reasons for assigning this weight, including that the objective medical evidence did not show that Plaintiff's condition had worsened and did not support a limitation to sedentary work. (Id.). The ALJ could appropriately point out that the statement supplied by both physicians was very similar, that Dr. Kopera had not seen Plaintiff since 2005, and that Dr. Kopera's duplicate statement about Plaintiff's abilities in 2012 was therefore given no weight. (AR 30). As already discussed, the regulations recognize that the nature and extent of the treatment relationship may affect the weight afforded by an ALJ. 20 C.F.R. § 416.927(c)(2).

## V. Conclusion

The Magistrate Judge concludes that the Commissioner's final decision applied the proper legal standards and is supported by substantial evidence in the record as a whole.

### RECOMMENDATION

Accordingly, the Magistrate Judge **RECOMMENDS** that the Commissioner's final decision be **AFFIRMED**.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

June 22, 2015
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).